UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHERYL SMITH,<br><br>Plaintiff,<br><br>v.<br><br>FRESNO COMMUNITY HOSPITAL AND MEDICAL CENTER, et al.,<br><br>Defendants. | No. 1:20-cv-01616-DAD-BAM<br><br>ORDER GRANTING DEFENDANT'S MOTION TO DISMISS<br><br>(Doc. No. 10) |

This matter is before the court on defendant Fresno Community Hospital and Medical Center ("FCHMC") dba Clovis Community Medical Center's ("CCMC") motion to dismiss plaintiff Sheryl Smith's complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. No. 10.) Pursuant to General Order No. 617 addressing the public health emergency posed by the COVID-19 pandemic, defendant's motion was taken under submission on the papers. (Doc. No. 11.) For the reasons explained below, the court will grant defendant's motion to dismiss with respect to plaintiff's third cause of action and grant plaintiff leave to amend her complaint.

**BACKGROUND**

This action arises from the alleged wrongful death of Mr. Bryson Ferguson, caused by allegedly negligent medical treatment that failed to detect what proved to be a fatal underlying condition.

1 Plaintiff filed her complaint on November 13, 2020 as the successor in interest to the Estate of Bryson Ferguson. (Doc. No. 1 ("Compl.").) Plaintiff was Mr. Ferguson's mother, and is the legal representative of his estate. (*Id.* at ¶ 3.) The complaint asserts causes of action against five separate defendants: FCHMC dba CCMC, Dr. Scott Ford, Chiropractic Health Center/Accident Recovery Center, Reza Shakeri, and John Ferguson. (*Id.* at ¶¶ 4–8.) Plaintiff's complaint alleges the following. Defendant FCHMC owns CCMC. (*Id.* at ¶ 4.) On October 26, 2019, decedent Bryson Ferguson ("Mr. Ferguson" or "decedent") was in a car accident which resulted in injuries to his left shoulder, arm, side, ankle, and the right side of his head. (*Id.* at ¶ 11.) He lost consciousness after the collision for some time and was in an altered mental state when he regained consciousness. (*Id.* at ¶ 11.) An ambulance transported Mr. Ferguson to CCMC, where medical providers were informed that he had lost consciousness at the scene of the accident. (*Id.* at ¶¶ 12–13.) CCMC had knowledge of Mr. Ferguson's medical history of epilepsy and seizures. (*Id.*) Mr. Ferguson complained to the nurses and doctors of a headache and pain on the right side of his face. (*Id.* at ¶ 13.)

Defendant Dr. Ford treated Mr. Ferguson while at CCMC but failed to take proper precautions to evaluate Mr. Ferguson's neurological condition. (*Id.* at ¶ 16.) Medical research and literature, which Dr. Ford should have been aware of, documents the heightened risks that epileptics are prone to suffer following a head injury, yet no special attention was given to Mr. Ferguson's complaints. (*Id.* at ¶ 16.) Mr. Ferguson was discharged from the hospital later that day on October 26, 2019 when Dr. Ford considered him to be stable and instructed him to consult a doctor if any symptoms developed following his discharge from the hospital. (*Id.* at ¶ 17.) Mr. Ferguson followed up twice with a medical provider after the accident. (*Id.* at ¶ 18.) On November 17, 2019, it was discovered that Mr. Ferguson had died two days earlier due to a breakthrough seizure. (*Id.* at ¶ 20.) Mr. Ferguson received inappropriate medical emergency screening compared to what similarly situated patients in his position have received. (*Id.* at ¶ 22.) If he had received the medically appropriate screening, Mr. Ferguson's life would not have ended when it did. (*Id.* at ¶ 22.)

/////

Plaintiff asserts claims for medical negligence and wrongful death. (*Id.* at ¶¶ 25–33.) Plaintiff also brings claims for violations of the Emergency Medical Treatment and Active Labor Act ("EMTALA") and California Health and Safety Code § 1317. (*Id.* at ¶¶ 34–46.)

On December 7, 2020, FCHMC filed a motion to dismiss plaintiff's EMTALA claim pursuant to Rule 12(b)(6) and argued that in the absence of that claim this court should decline to exercise supplemental jurisdiction over plaintiff's state law claims brought against FCHMC. (Doc. No. 10 at 1.) On January 5, 2021, plaintiff filed her opposition to defendant's motion to dismiss. (Doc. No. 12.) On January 12, 2021, defendant filed its reply thereto. (Doc. No. 15.)

**LEGAL STANDARD**

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the legal sufficiency of the complaint. *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983). "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). A claim for relief must contain "a short and plaint statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Though Rule 8(a) does not require detailed factual allegations, a plaintiff is required to allege "enough facts to state a claim for relief that is plausible on its face." *Bell Alt. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

In determining whether a complaint states a claim on which relief may be granted, the court accepts as true the allegations in the complaint and construes the allegations in the light most favorable to the plaintiff. *Hishon v. King & Spalding*, 467 U.S.69, 73 (1984); *Love v. United States*, 915 F.2d 1242, 1245 (9th Cir. 1989). It is inappropriate to assume that the plaintiff "can prove facts which it has not alleged or that the defendants have violated the . . . laws in ways that have not been alleged." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

/////

**DISCUSSION**

Defendant FCHMC filed this motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Defendant argues that plaintiff offers only a conclusory pleading that is lacking factual allegations in support of her EMTALA claim. (Doc. No. 10-1 at 4.) Below, the court will address whether plaintiff has stated a cognizable claim under the EMTALA.

**A.    Whether Plaintiff States an EMTALA Claim Against Defendant**

Plaintiff brings her third claim for relief solely against FCHMC pursuant to the EMTALA, 42 U.S.C. § 1395dd et seq. (*Id.* at ¶ 35.) The EMTALA requires hospitals to provide an "appropriate medical screening examination within the capability of the hospital's emergency department." *Jackson v. East Bay Hosp.*, 246 F.3d 1248, 1254 (9th Cir. 2001); *see also* 42 U.S.C. § 1395dd(a) (1986). The screening is meant to determine "whether or not an emergency medical condition . . . exists." *Id.* An emergency medical condition within the meaning of the statute is defined as:

> a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in – (i) placing the health of the individual . . . in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part . . . .

42 U.S.C. § 1395dd(e)(1)(A).

Plaintiff alleges that FCHMC did not provide the decedent with screening as required by the EMTALA for two reasons. (*Id.* at ¶ 36.) First, plaintiff alleges that the screening examination the decedent received was not sufficient compared to that received by other patients in his position. Second, plaintiff alleges that the screening examination in this case was cursory, and therefore did not appropriately identify Mr. Ferguson's emergency condition based on his symptoms and relevant medical history of epilepsy. (*Id.*) With regard to this second allegation, plaintiff contends that Mr. Ferguson had an emergency medical condition as defined by the EMTALA because of his symptoms, which suggested a life-threatening neurological condition. (*Id.* at ¶ 38.) Plaintiff further asserts that Mr. Ferguson was improperly discharged from the

4

hospital in an unstable condition after receiving a deficient screening examination. (*Id.*) For these reasons, plaintiff claims that FCHMC violated the EMTALA's screening requirement, resulting in Mr. Ferguson's death. (*Id.* at ¶ 39.)

"As the text of [the EMTALA] clearly states, the hospital's duty to stabilize the patient does not arise until the hospital first detects an emergency medical condition." *Jackson*, 246 F.3d at 1254–55 (quoting *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1259 (9th Cir. 1995)). In *Jackson*, the court considered whether a hospital violated the EMTALA's screening requirements by providing what plaintiff asserted to be insufficient medical screening. *Jackson*, 246 F.3d at 1255. That insufficient screening allegedly led the hospital to fail to order the correct diagnostic testing which, if administered, would have led to an appropriate diagnosis and prevented the patient's death. *Id.* The Ninth Circuit in *Jackson* recognized that the EMTALA does not require a hospital to ensure medically adequate examinations and that, instead, the act's purpose was to limit hospitals from refusing to treat patients who were not covered by insurance or who could not otherwise pay for medical services. *Id.* at 1256; *see also Lopez v. Contra Costa Regional Medical Center*, 903 F. Supp. 2d 835, 838 (N.D. Cal. 2012) ("Congress passed EMTALA, also known as the 'Patient Anti Dumping Act,' to prohibit hospital emergency rooms from refusing to treat indigent and uninsured patients or transferring patients to other hospitals without first stabilizing their condition.") Interpreting the statute, the Ninth Circuit adopted the comparative test previously adopted by several other circuits under which "a hospital satisfies EMTALA's 'appropriate medical screening' requirement if it provides a patient with an examination comparable to the one offered to other patients presenting similar symptoms, unless the examination is so cursory that it is not 'designed to identify acute and severe symptoms that alert the physician of the need for immediate medical attention to prevent serious bodily injury.'" *Jackson*, 246 F.3d at 1256 (quoting *Eberhardt*, 62 F.3d at 1257). The Ninth Circuit in *Jackson* also recognized that a hospital's duty to stabilize a patient does not arise until an emergency medical condition is detected and that if no such condition is recognized, the hospital does not violate the EMTALA. *Jackson*, 246 F.3d at 1257 (quoting *Eberhardt*, 62 F.3d at 1259).

/////

In *Jackson*, the court concluded that despite the patient's death, the hospital had not violated the EMTALA because it had complied with the screening requirements of the statute. *Jackson*, 246 F.3d at 1256. The court observed that the plaintiffs had failed to present evidence that the decedent had been treated differently than other similarly situated patients and that because it had not actually detected the underlying condition upon which the plaintiff's claim was based, the hospital had not violated the Act. *Id.* at 1257. Under the "actual detection" rule adopted by the Ninth Circuit, unless actual knowledge of the emergency medical condition by the hospital is shown, the EMTALA is not violated and a mere failure to diagnose the actual cause of a patient's symptoms cannot serve as the basis for a violation of EMTALA's stabilization requirements. *Id.*

Below, the court will analyze the allegations of plaintiff's complaint in support of the two prongs upon which a violation of the EMTALA can be found: (1) failure to stabilize a patient's known emergent condition; and (2) providing disparate screening to a patient.

    1.    <u>Whether Plaintiff Alleges a Claim for Failure to Stabilize an Emergent Condition</u>

A hospital's duty to stabilize a patient pursuant to EMTALA arises only once the hospital detects an emergency medical condition. *Jackson*, 246 F.3d at 1254–55 (quoting *Eberhardt*, 62 F.3d at 1259). A hospital or a doctor's failure to diagnose the true cause of a patient's symptoms cannot serve as the basis for a violation of EMTALA's stabilization requirements. *Id.* at 1257. If a doctor does not detect a medical emergency, the hospital has no duty under the EMTALA to stabilize the patient before discharge. *Baker v. Adventist Health, Inc.*, 260 F.3d 987, 994 (9th Cir. 2001). To state a valid EMTALA claim, a plaintiff must allege that the decedent had an emergency condition which the hospital detected, yet failed to stabilize.

In her complaint, plaintiff alleges that FCHMC failed to provide the decedent with appropriate emergency screening because the screening provided was so cursory that it could not identify the decedent's emergency condition. (Compl. at ¶ 36.) Plaintiff alleges that when Mr. Ferguson entered the hospital on October 25, 2019, he was clearly presenting an emergent condition under the EMTALA. (*Id.* at ¶ 37.) Plaintiff argues that, when he was discharged from
/////

FCHMC, Mr. Ferguson was in an unstable condition and unscreened by the emergency department. (*Id.*)

Defendant argues that the hospital's failure to conduct additional diagnostic testing on decedent despite his medical history does not constitute a violation of the EMTALA, although defendant concedes that its failure to do so may constitute medical malpractice. (Doc. No. 15 at 3); *see Hoffman v. Tonnemacher*, 425 F. Supp. 2d 1120, 1135 (E.D. Cal. 2006). Defendant further contends that plaintiff has not alleged what the symptoms of decedent's emergency condition were nor why she believes Mr. Ferguson was unstable when he was discharged from the hospital, considering he lived for 25 days after his discharge. (*Id.* at 4–5.)

In her opposition, plaintiff cites to a handful of cases that she asserts show her allegations are sufficient to support both her EMTALA claim and her medical malpractice claims against defendant. (Doc. No. 12 at 7–8.) Plaintiff first cites *Gatewood v. Washington Healthcare Corporation,* 933 F.2d 1037, 1041 (9th Cir. 1991) in support of her assertion that "inappropriate medical care of an emergency patient may constitute both medical malpractice and an EMTALA claim." (*Id.* at 7.) However, the Ninth Circuit in *Gatewood* concluded that the plaintiff's claim in that case was properly dismissed for failing to state a cause of action under EMTALA because "[the court] cannot agree that [EMTALA] creates a sweeping federal cause of action with respect to what are traditional state-based claims of negligence or malpractice." *Gatewood*, 933 F.2d at 1041. Plaintiff also cites *Power v. Arlington Hospital Association*, 42 F.3d 851, 859 (4th Cir. 1994), arguing that the decision in that case shows how medical malpractice claims may overlap with the EMTALA. (Doc. No. 12 at 7.) However, the court's decision in *Power* in fact recognized that both a medical malpractice claim and a claim of disparate treatment under the EMTALA would be established *only* if the hospital failed to perform all of or part of the standard battery of tests required under the appropriate medical protocol. *Power*, 42 F.3d at 859. In contrast to plaintiff's framing of that decision, the court in *Power* held that if the hospital performs standard required tests but in "evaluating the results [from those tests] draws an incorrect conclusion, a violation of EMTALA may not be established, but medical negligence may be." *Id.* In this vein, "the plain language of EMTALA informs [the court] that a medical

7

1  screening examination is 'appropriate' if it is designed to identify *acute and severe* symptoms that
2  alert the physician of the need for *immediate* medical attention to prevent serious bodily injury."
3  *Eberhardt*, 62 F.3d at 1257.  In other words, a hospital that performs all standard required tests,
4  tests which identify acute and severe symptoms, cannot be found liable under EMTALA for a
5  misreading of the test results or a misdiagnosis stemming therefrom.

6  Similar to the plaintiffs in *Jackson*, plaintiff here has not alleged sufficient facts which, if
7  proven, would show the defendant hospital failed to stabilize an emergency condition presented
8  by the decedent.  Plaintiff acknowledges that defendant screened Mr. Ferguson and released him
9  once FCHMC believed he was stable. (Compl. at ¶ 17.)  However, plaintiff alleges that defendant
10  did not give Mr. Ferguson "a screening examination that addressed his probable post-collision
11  neurological symptoms as compared to pertinent emergency policies and protocols in effect at the
12  time." (Compl. at ¶ 36.)  Plaintiff alleges the screening examination of Mr. Ferguson was cursory
13  and not in line with pertinent emergency policies, but provides no factual allegations explaining
14  why or how that was the case.  (*Id.*)  "The EMTALA does not require physicians to detect
15  medical conditions that are not manifested by acute and severe symptoms, nor those that do not
16  require immediate medical attention to prevent serious bodily injury." *Eberhardt*, 62 F.3d at
17  1257.

18  Here, plaintiff has failed to adequately allege that Mr. Ferguson's neurological condition
19  was manifested by any "acute" or "severe" symptoms, that the condition required urgent medical
20  attention (as would appear belied by decedent having lived another 25 days following his hospital
21  discharge), or that the standard tests performed by defendant would likely fail to detect such acute
22  and severe symptoms.  (*See* Doc. No. 15 at 4–5.)  Defendant's duty under EMTALA is to screen
23  the patient and stabilize whatever emergency condition is detected at the time.  *See Baker*, 260
24  F.3d at 994.  Even if defendant failed to properly diagnose Mr. Ferguson, it would not alone
25  provide grounds for finding a violation of the EMTALA.  The court concludes that although
26  plaintiff has alleged that defendant failed to detect the correct underlying medical condition, her
27  allegations even if proven to be true fail to establish that defendant violated the EMTALA in
28  screening Mr. Ferguson and releasing him when defendant believed he had been stabilized.

2. <u>Whether Plaintiff Alleges a Claim for Disparate Treatment</u>

To properly state a claim that defendant screened Mr. Ferguson in a disparate manner compared with other patients in similar situations, plaintiff must allege facts "sufficient to support a finding that [he] received a materially different screening than that provided to others in [his] condition. It is not enough to proffer expert testimony as to what treatment should have been provided to a patient in the plaintiff's position." *Romar ex rel. Romar v. Fresno Cmty. Hosp. and Med. Ctr.*, 583 F. Supp. 2d 1179, 1185 (E.D. Cal. 2008) (*quoting Reynolds v. Maine Gen. Health*, 218 F.3d 78, 84 (1st Cir. 2000)). Moreover, the EMTALA does not require hospitals to provide identical screening to patients presenting different symptoms, nor does it require hospitals to perform screenings beyond their capabilities. *Baker*, 260 F.3d at 994. However, "evidence that a hospital did not follow its own screening procedures can support a finding of EMTALA liability for disparate treatment." *Id.* at 995 (quoting *Battle v. Mem. Hosp.*, 228 F.3d 544, 558 (5th Cir. 2000)); *see also Power*, 42 F.3d at 859 (where a hospital denies that it has any standard emergency room protocols or procedures "an EMTALA claim may be established through proof of a failure to meet the standard of care to which the Hospital adheres" even if "allowance of such proof potentially blurs the line somewhat between a malpractice claim and an EMTALA claim[.])" (quotation omitted). Thus, for plaintiff here to sufficiently allege that Mr. Ferguson received disparate treatment, she must allege that he was treated differently from other patients, or that the hospital violated its own screening procedures.

In her complaint, plaintiff alleges that FCHMC failed to provide Mr. Ferguson with appropriate emergency screening because the screening he received was not comparable to what other patients in his situation, with his symptoms would have received. (Compl. at ¶ 36.) Plaintiff alleges that Mr. Ferguson "did not receive a screening examination that addressed his probable post-collision neurological symptoms as compared to pertinent emergency policies and protocols in effect at the time." (*Id.*) In opposing defendant's motion to dismiss, plaintiff contends that "[a]n emergency medical screening examination is inappropriate if it is not designed to identify acute and severe symptoms indicating the need for immediate medical

/////

9

attention to prevent death or serious bodily injury." (Doc. No. 12 at 7) (quoting *Eberhardt*, 62 F.3d at 1257.)

As defendant points out, the allegations of plaintiff's complaint are conclusory and do not provide any facts supporting or explaining in what way Mr. Ferguson received different treatment from other similarly situated patients. (Doc. Nos. 15 at 4; 12 at 8.) In this regard, plaintiff alleges that the hospital "should have consulted a neurology specialist regarding Mr. Ferguson's symptoms, and that they also should have ordered and had performed imaging studies that would have enabled them to ascertain the post-traumatic condition of his brain." (Compl. at ¶ 16.) While these allegations theoretically may support a basis for a medical malpractice claim, they do not support a claim for a violation of adequate screening under EMTALA. *See Jackson*, 246 F.3d at 1255 (quoting *Marshall v. E. Carroll Parish Hosp. Serv.*, 134 F.3d 319, 323–24 (5th Cir.1998) ("[A] treating physician's failure to appreciate the extent of the patient's injury or illness . . . may constitute negligence or malpractice, but cannot support an EMTALA claim for inappropriate screening . . . . It is the plaintiff's burden to show that the Hospital treated her differently from other patients")). Here, plaintiff has simply alleged no facts which if proven would demonstrate that another patient in the decedent's situation or presenting his symptoms would have received different treatment or that the hospital violated its own screening procedures in connection with his treatment.

Accordingly, plaintiff has not sufficiently alleged that defendant violated the EMTALA under either prong of that provision.

**B.   Leave to Amend**

Generally, "[c]ourts are free to grant a party leave to amend whenever 'justice so requires,' and requests for leave should be granted with 'extreme liberality.'" *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 972 (9th Cir. 2009). There are several factors a district court considers in whether to grant leave to amend, including undue delay, the movant's bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility. *Brown v. Stored Value Cards, Inc.*, 953 F.3d 567, 574 (9th Cir. 2020) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Of the factors from *Foman*, the

court should particularly consider prejudice to the opposing party. *Id.*; *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

Here, there is no indication that allowing amendment to provide plaintiff an opportunity to cure the noted deficiencies in the allegations of the complaint would be prejudicial to defendant, and defendant does not so claim. There is also no indication that plaintiff has acted in bad faith, and there have been no other attempts to cure deficiencies by previously allowed amendments. Plaintiff will therefore be granted leave to amend.[1]

**CONCLUSION**

Accordingly,

1. The motion to dismiss (Doc. No. 10) brought on behalf of defendant Fresno Community Hospital and Medical Center is granted;
2. Plaintiff's third cause of action for alleged violation of the EMTALA is dismissed without prejudice; and
3. Within thirty (30) days of service of this order plaintiff shall file any amended complaint or notify the court of her intention to not proceed with this action.

IT IS SO ORDERED.

Dated:   **July 20, 2021**

　　　　　　　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE

---

[1] Defendant also requests that the court dismiss plaintiff's complaint in its entirety for lack of supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c). (Doc. No. 10 at 2.) In the event no amended complaint is filed or the noted deficiencies are not cured by an amended complaint, absent additional argument on the issues addressed by this order, the court would intend to decline to exercise supplemental jurisdiction and would dismiss the complaint without prejudice to the filing of an action in state court.